Hillsborough, }
May 3, 1938. }

LEREILDA CHEVALIER, *Adm'x*

*v.*

BOSTON & MAINE RAILROAD.

*Emile Lemelin* and *Ernest R. D'Amours* (*Mr. D'Amours* orally), for the plaintiff.

*Warren, Wilson, McLaughlin & Wiggin* (*Mr. Wiggin* orally), for the defendant.

MARBLE, J. The decedent was employed in a machine shop in Nashua. At the time of the collision he was driving west on route 101-A toward his home in Amherst. He had worked in Nashua for a year and a half and had passed over Ponomah Crossing twice each working day during that period. He was returning from work when the accident happened.

A witness who was driving behind the decedent stated that it was snowing very hard, that the wet snow stuck to his windshield, and that he could not see plainly except through the space cleared by his "sleet cleaner." He testified that the time was "about four-thirty" in the afternoon, that it was "fairly dark," and that he had turned on the lights of his car.

He had been following the decedent's automobile for about twenty minutes at a speed of 25 or 30 miles an hour. When he reached a point some 300 feet east of the crossing, he saw the decedent put out his hand. The stop light of the decedent's car went on, and the witness then "looked and saw the headlight of the engine coming down the track." The decedent's car swerved to the left and swung onto the crossing where it was struck by the train. Marks discovered on the road the next morning indicated that the car had skidded for a distance of about 56 feet.

The train was a regular passenger train running from Elmwood to Nashua, and was on time.

Reference is made to a pile of sand (presumably for use on the road during the winter months) situated about 12 feet from the northerly edge of the highway and 48 feet east of the crossing. The photographs, introduced at the trial, indicate that this pile of sand could have had nothing whatever to do with the decedent's failure to discover the train earlier than he did. According to a plan introduced by the plaintiff the track extended north from the crossing in a straight course for more than 500 feet. The civil engineer who made the plan testified that at a point 100 feet east of the crossing there was an unobstructed view up the track to the north for a distance of "at least four hundred feet"; that, indeed, at that point, the headlight of an engine proceeding southward could be seen "beyond the limits of" the plan. Before the decedent reached a point where the sand pile could have interfered with his view he had discovered the train and applied his brakes.

The jury were instructed without objection that the whistle of the locomotive was sounded and the bell rung. There is no claim that warning signs had not been installed in compliance with the

statutory provisions. There was a cross-arm sign, 18.2 feet high, at the crossing. Painted on the arms of this sign were the words, "Rail Road Crossing. Stop Look and Listen." A circular sign displaying the letters R. R. was erected on the northerly side of the road at a point 312 feet east of the crossing. Near this point the road began to curve toward the south. It crossed the track at a slight angle and then turned north, running for some distance approximately parallel with the track.

Although the snowplows had thrown up banks of snow at the sides of the road, these banks were not high enough to prevent the driver of a car from seeing clearly an approaching train. Opposite a point in the highway 150 feet east of the crossing stood a Norway pine, which was the most westerly of a number of scattered pine trees on the northerly side of the road. From this point onward to the crossing the view of the track to the north was clear.

The crossing, though within the limits of the town of Amherst, was some distance from any settlement. The speed of the train (estimated at 25 or 30 miles an hour) was "normal."

The reasonable need for crossing protection in addition to the statutory warnings is to be determined by the special and unusual dangers of the particular crossing. *Stocker* v. *Railroad*, 83 N. H. 401, 405; *Despres* v. *Railroad*, 87 N. H. 427, 429; *Cyr* v. *Railroad*, 88 N. H. 278, 280; *Austin* v. *Railroad*, *ante*, 307. In the present case the evidence fails to disclose any peculiar peril connected with the crossing in question. Certainly a mere change in the weather whereby driving becomes more hazardous is not a special and unusual danger within the meaning of the rule.

In the case of *Austin* v. *Railroad*, *supra*, on which the plaintiff relies, there were many "special features of pertinent bearing" (*Stocker* v. *Railroad*, *supra*), including the use by the railroad of a gasoline-electric locomotive which was so constructed as to obscure the engineer's view in the direction from which the driver of the automobile in that case was approaching.

But even if the defendant might be deemed at fault for failing to maintain an automatic warning signal at the crossing, it is difficult to understand how such failure could have caused the decedent's death. The speed of the train was the same as that of the decedent's automobile, and the relative positions of the highway and track were such that as the decedent entered the curve he must have been almost directly facing the headlight of the approaching engine. He did not see this headlight or hear the engine bell until too late to

avoid the accident, and it is entirely a matter of conjecture whether his attention would have been attracted any sooner by the lights or bells of an automatic signal.

The defendant was entitled to a directed verdict on the issue relating to the adequacy of the crossing protection. This conclusion makes it unnecessary to decide whether the decedent was negligent as a matter of law.

*Judgment for the defendant.*

All concurred.